**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JASON BAILEY,

     Plaintiff,

v.                                    Civ. No. 20-1163 KK

KILOLO KIJAKAZI,
Acting Commissioner of the Social
Security Administration,

     Defendant.

**MEMORANDUM OPINION AND ORDER[1]**

THIS MATTER is before the Court on Plaintiff Jason Bailey's Motion to Reverse the Administrative Law Judge (ALJ's) Unfavorable Decision Dated February 27, 2020, or Alternatively, to Remand the Case Back to the Administrative Law Judge (Doc. 22) ("Motion"), filed June 4, 2021. Mr. Bailey filed a memorandum concurrently with the Motion. (Doc. 23.) On August 31, 2021, the Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition to the Motion, and on September 13, 2021, Mr. Bailey filed a reply in support of it. (Docs. 27, 28.) Having meticulously reviewed the entire record and the relevant law and being otherwise fully advised, the Court finds that Mr. Bailey's Motion should be GRANTED, the Commissioner's decision should be REVERSED, and this matter should be REMANDED to the Commissioner for further proceedings.

## I. Background and Procedural History

Mr. Bailey applied for disability insurance benefits ("DIB") under Title II of the Social Security Act on August 24, 2017, at age 41, alleging disability since May 13, 2017 due to

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the undersigned to conduct proceedings and enter judgment in this case. (Doc. 13.)

depression, bipolar disorder, anxiety, post-traumatic stress disorder ("PTSD"), back injury, hand injury, neuropathy, alcoholism, and gastrointestinal issues. (AR 98–99.)[2] Mr. Bailey brings this suit pursuant to 42 U.S.C. § 405(g), seeking reversal of the Commissioner's decision denying his application. (Doc. 2.)

## A. Factual Background

Mr. Bailey testified that he most recently worked at an automotive shop changing oil and tires; however, he stopped working in May 2017 due to problems with his back and hands. (AR 56, 58.) He further testified that he lives with his girlfriend and her two children, aged 13 and 14, and "help[s] watch" the children. (AR 55.) He stated that he spends his days "do[ing] a little housework" and "tak[ing] care of business here and there," with the help of a driver. (AR 62.) More specifically, he reported paying rent and bills, doing dishes, vacuuming, and "sometimes" cooking, and also sweeping and mopping, though he added that he "can't stand long enough to really do it," so he "take[s] little breaks in between[.]" (AR 62-63.)

As further discussed below, Mr. Bailey received treatment for numerous ailments during the relevant time frame.

### 1. Lumbar, thoracic, and cervical spine disorders

On July 26, 2017, Mr. Bailey saw Thomas Black, C.N.P., for "lower thoracic and lumbar pain." (AR 634.) CNP Black noted "left paraspinal muscles with greater tone,"[3] diagnosed Mr. Bailey with "[c]hronic back pain," and discussed physical therapy. (AR 635.) A thoracic spine x-ray on July 31, 2017 revealed "a mild T11 compression fracture" of indeterminate age. (AR 705.)

---

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on April 8, 2021. (Doc. 19.)

[3] This note, like many others in the administrative record, is cut off on the right side. (AR 635; *see, e.g.*, AR 499-553, 598-637.) Thus, it does not indicate to what, if anything, CNP Black compared the tone of Mr. Bailey's left paraspinal muscles on July 26, 2017. (AR 635.) On remand, the parties may wish to determine whether complete copies of the cut-off medical records are available and, if so, supplement the administrative record accordingly.

Between August 29, 2017 and October 10, 2017, Mr. Bailey attended seven physical therapy sessions at Sierra Vista Hospital for his back pain. (AR 557-58, 568, 577, 581, 605-06, 611-12.) Kim Keeys-Jordan, M.S.P.T., P.T., noted that Mr. Bailey presented at his initial evaluation with "objective clinical findings consistent w[ith] chronic back pain." (AR 558-59.) At a visit with Owen Dewitt, M.D., on September 11, 2017, Mr. Bailey reported that physical therapy "helped his back for about a couple of days[.]" (AR 608-09.) A lumbosacral spine x-ray on December 20, 2017 revealed "[c]hronic" "[a]nterior compression deformity of T11" with "loss of height" of "approximately 50%," as well as "[e]xaggerated lordosis at L5-S1." (AR 457.)

On August 7, 2018, Mr. Bailey saw L. Tyson Sloan, D.O., for "constant, aching and sharp" low back pain made worse by lifting objects, which began in 2004 after an accident resulting in the T11 compression fracture.[4] (AR 664-66.) On exam, Dr. Sloan noted "mild tenderness at the bilateral paraspinals" of the lumbar spine. (AR 665.) He referred Mr. Bailey to physical therapy, prescribed baclofen, and ordered another lumbar spine x-ray. (AR 665.) This x-ray, taken the same day, showed "[a] moderate compression deformity of T 11"; the radiologist recommended "projections of the thoracic spine or possibly MRI of the spine which may help to determine age of the fracture." (AR 832.)

Between August 21 and October 4, 2018, Mr. Bailey attended twelve physical therapy sessions at Sierra Vista Hospital for his low back pain. (AR 727-47, 750-58, 761-68.) At a follow up appointment with Dr. Sloan on September 18, 2018, Mr. Bailey complained of low and mid back pain and "weakness in the mid back," and reported that improvement from physical therapy lasted about a day before the pain returned. (AR 659.) Dr. Sloan noted "tenderness at the bilateral paraspinals" on examination of the lumbar spine. (AR 660.) Observing that Mr. Bailey "did not

---

[4] Mr. Bailey also reported that the accident caused a clavicular fracture; consistently, a July 17, 2018 chest x-ray showed an "[o]ld left mid clavicle deformity." (AR 664, 700.)

have significant improvement of low back pain following physical therapy" and expressing concern that he might have early onset facet arthropathy, Dr. Sloan requested insurance authorization for a lumbar spine MRI. (AR 660.)

Mr. Bailey saw Dr. Sloan again on November 6, 2018, reporting that his back pain was "unchanged" and that he continued to "have numbness and tingling and sensation of weakness in the lower extremities." (AR 856.) He also reported that standing worsened the pain, and muscle tightness radiating into the back and neck caused "frequent headaches." (AR 856.) On exam, Dr. Sloan noted "tenderness at the bilateral paraspinals" of the lumbar spine and "tenderness of the cervical bilateral paraspinal." (AR 857.) Dr. Sloan performed a greater occipital nerve block to treat Mr. Bailey's associated headaches. (AR 857.)

A lumbar spine MRI on December 6, 2018 revealed "[m]ild narrowing of the L4-5 and L5-S1 disc spaces along with decreased T2 signal intensity related to desiccation," "[c]entral disc protrusion and ligamentous hypertrophy" at L4-5, and "[a]nnular fissure" at L5-S1. (AR 795.) At a follow up appointment with Dr. Sloan on December 18, 2018, Mr. Bailey again reported that his back pain was "unchanged" and that "standing and activities" made the pain worse. (AR 851.) Dr. Sloan noted "tenderness at the bilateral paraspinals" of the lumbar spine and observed that Mr. Bailey's lumbar spine MRI was "consistent" with his symptoms. (AR 852.) Because "MRI does show inflammation in arthropathy of the facet joints" and Mr. Bailey had "failed conservative measures with medication and physical therapy," Dr. Sloan requested insurance authorization for facet joint injections. (AR 852.) At another follow up appointment on February 5, 2019, Mr. Bailey reported that his back pain persisted and his headaches had returned; Dr. Sloan performed another greater occipital nerve block. (AR 846-47.)

On June 26, 2019, Dr. Sloan noted that Mr. Bailey's low back pain had improved with facet joint injections but he complained of mid back pain. (AR 841-42.) Exam of the lumbar spine revealed "tenderness at the lateral paraspinals," and exam of the thoracic spine revealed "tightness of the parascapular m[usculature], trigger points and rotated T6." (AR 842.) Dr. Sloan referred Mr. Bailey to physical therapy, performed "osteopathic manipulation to the mid back," and administered corticosteroid trigger point injections to the thoracic paraspinals. (AR 842.) Mr. Bailey saw Dr. Sloan again on November 27, 2019, at which time Dr. Sloan administered trigger point injections to the cervical paraspinals to treat Mr. Bailey's neck pain and associated headaches. (AR 836-37.)

Dr. Sloan subsequently ordered an MRI of the cervical spine, which was performed on January 9, 2020. (AR 865.) The MRI report noted "[v]ery mild degenerative changes without a moderate or high-grade stenosis." (AR 865.) On January 27, 2020, Dr. Sloan added that though the MRI "did not show significant stenosis of the cervical spine or nerve root impingement," it "did show significant arthropathy and spondylosis." (AR 861.) Because trigger point injections and occipital nerve block injections had been only temporarily effective and "[p]hysical therapy was not beneficial," Dr. Sloan recommended medial branch blocks and radiofrequency ablation to treat Mr. Bailey's cervical spondylosis. (AR 861-62.)

### 2.   *Bilateral finger joint swelling and right long finger deformity*

On October 5, 2017, CNP Black noted bilateral pain and swelling of Mr. Bailey's finger joints. (AR 598-99.) He recommended ice, heat, and over-the-counter pain relievers, and noted Mr. Bailey had an appointment "with ortho" later that month. (AR 598-99.) Consultative examiner Em Ward, M.D., also noted Mr. Bailey's report of "[p]ain and swelling in fingers" and found "R

third digital torsion[, p]possible small effusions in some PIP joints[, and] L second and third PIP

joint tenderness" during an examination on October 13, 2017. (AR 378-80.)

On October 30, 2017, Mr. Bailey saw Charles Metzger, M.D., for right long finger

deformity resulting from a 2001 fracture that "healed with supination malrotation." (AR 689–92.)

Dr. Metzger performed a right long finger metacarpal derotational osteotomy on November 15,

2017. (AR 394-96.) On January 3, 2018, Dr. Dewitt noted that Mr. Bailey's finger was still a "few

degree[s] rotated but is greatly improved[.]" (AR 534.) At a follow up appointment with Dr.

Metzger on January 29, 2018, Mr. Bailey reported he was "not having pain or problems" with his

right long finger, was "pleased with the cosmetic and functional result" of the surgery, and could

"use his hand normally." (AR 683.)

### 3.    Left and right lateral epicondylitis

At his visit with Dr. Dewitt on January 3, 2018, Mr. Bailey also reported tenderness at the

left lateral epicondyle "consistent with a lateral epicondylitis[.]" (AR 534.) Likewise, at his

January 29, 2018 visit with Dr. Metzger regarding his right long finger, Mr. Bailey asked to see

Dr. Metzger "for left lateral epicondylitis." (AR 684.) And, on February 14, 2018, Mr. Bailey

reported left elbow pain "for several months" to Estela Rubin, C.N.P. (AR 528.) Dr. Dewitt and

CNP Rubin both noted left lateral epicondyle tenderness on examination. (AR 528, 534.)

On March 5, 2018, Mr. Bailey saw Dr. Metzger for his left elbow pain. (AR 680.) Noting

tenderness "[s]lightly inferior to the lateral condyle" and "reproduction of pain with resisted wrist

extension" on exam, Dr. Metzger diagnosed Mr. Bailey with lateral epicondylitis of the left

humerus. (AR 681.) He gave Mr. Bailey a wrist splint and administered a corticosteroid injection

to the joint. (AR 681.) At a subsequent visit on June 12, 2018, Mr. Bailey reported the pain was

"worse with certain activities like gripping or twisting," and Dr. Metzger "reviewed activity

modification in detail" as "the most important consideration in the treatment of this condition." (AR 677-78.) He also administered another corticosteroid injection. (AR 678.)

On July 9, 2018, Mr. Bailey saw Dr. Metzger again, reporting that relief from the first injection lasted "about a month," and relief from the second lasted "about 4-5 days." (AR 673.) He indicated the wrist splint "help[ed] a little bit but not that much," and he "ha[d] difficulty just picking up a can." (AR 673.) On exam, Dr. Metzger noted "maximal tenderness . . . at the posterior inferior part of the lateral epicondyle" and "reproduction of pain with resisted wrist extension, and resisted forearm supination[.]" (AR 674.) He also noted "reduced strength of lifting with the forearm pronated because of sharp recreation of the pain[.]" (AR 674.) In light of "failed nonoperative treatment" including "injections, stretching, activity modification, anti-inflammatories, [and] splinting," Dr. Metzger recommended surgery. (AR 674.) He told Mr. Bailey there was "a good chance that this surgery [would] not help him," and "[i]t might make the condition worse." (AR 674.) However, Mr. Bailey indicated he was "willing to take the risk" because "he cannot live with it the way it is now, he cannot function at all[.]" (AR 674.)

Mr. Bailey underwent a left lateral extensor tendon release of extensor carpi radialis brevis with partial ostectomy of lateral epicondyle on July 18, 2018. (AR 654-55.) In his operative report, Dr. Metzger noted "[t]here was yellowish, glassy, degenerative tissue through 90% of the width" of Mr. Bailey's extensor carpi radialis brevis tendon "extend[ing] throughout the entire thickness of that tendon." (AR 654-55.) Dr. Metzger excised "[t]he diseased tendon" and resected part of the underlying bone. (AR 654-55.) Pathology revealed "myxoid degeneration" of the excised tendon. (AR 696.)

At a follow up appointment on August 2, 2018, Mr. Bailey reported he was "doing well," but "ha[d] pain sometimes" and could not "really tell if there [was] much of a difference since

before surgery" because he "ha[d] been appropriately protective over the elbow." (AR 671.) Dr. Metzger noted that "everything look[ed] very good"; however, he "emphasized the importance of activity modification," "suggested [Mr. Bailey] . . . not do anything that involves gripping, pushing, pulling, or even something simple like opening a jar, nothing that causes any pain," and "t[old] him it can take a few months maybe even 6 months before return to normal activity." (AR 671–72.)

At a January 27, 2020 visit with Dr. Sloan, Mr. Bailey reported right elbow pain with weakness gripping objects for two to three weeks. (AR 861-62.) On exam, Dr. Sloan noted "[t]enderness to palpation over the lateral epicondyle of the right humerus" and "[p]ositive Cozen sign." (AR 861.) Dr. Sloan diagnosed Mr. Bailey with lateral epicondylitis of the right humerus and administered a corticosteroid injection to the joint. (AR 862.)

### 4.    Psychological disorders

In addition to his physical impairments, Mr. Bailey suffered from psychological impairments throughout the relevant time period. He attended psychotherapy with Dorcas F. Brem, L.P.C.C. from July to August 2017, and Jessica Johnson, L.M.F.T., from April to June 2018. (AR 365–76, 459–94.) Ms. Brem noted Mr. Bailey's symptoms of anxiety, depression, mania, and panic, and his report that his psychotropic medications affected his memory and made him feel "foggy." (AR 365-71.) Ms. Johnson noted Mr. Bailey's excessive anxiety more days than not for at least six months about a number of events and activities, his difficulty controlling the anxiety, and restlessness, difficulty concentrating, irritability, and sleep disturbance associated with it. (AR 474.) She further noted that anxiety and related symptoms caused Mr. Bailey clinically significant distress or impairment, and diagnosed Mr. Bailey with generalized anxiety disorder ("GAD"). (AR

461, 474.) In January 2020, Mr. Bailey testified that he had just changed to a new psychotherapist but had only seen her once and could not remember her name.[5] (AR 72.)

Mr. Bailey also regularly attended appointments at Sierra Vista Hospital to manage his psychotropic medications, including mirtazapine, quetiapine, buspirone, escitalopram, lamotrigine, naltrexone, and belsomra. (AR 499–519, 529-32, 534-37, 540-43, 546-48, 622-24, 747-50, 758-61, 768-78.) At these visits, Sherri Musgrave, C.N.P., and Karen Samuels, C.N.P., repeatedly noted Mr. Bailey's depression, anxiety, mood swings, and abnormal affect, and listed psychiatric diagnoses of Bipolar II disorder, major depressive disorder, anxiety disorder, unspecified mood disorder, and insomnia. (AR 499–519, 529-32, 534-37, 540-43, 546-48, 622-24, 747-50, 758-61, 768-78.)

## B. Agency Determination

Mr. Bailey applied for DIB on August 24, 2017. (AR 98–99.) His claim was denied initially and on reconsideration. (AR 111, 132.) Administrative Law Judge ("ALJ") David J. Shea held a hearing on January 17, 2020, at which Mr. Bailey, his girlfriend, and an impartial vocational expert ("VE") testified. (AR 47–96.)

The ALJ issued an unfavorable ruling on February 27, 2020, finding Mr. Bailey not disabled under the five-step sequential evaluation process.[6] (AR 26–40). At step one, the ALJ found Mr. Bailey had not engaged in substantial gainful activity since the alleged disability onset date. (AR 31.) At step two, he found Mr. Bailey suffered from "the following severe impairments: dysfunction of major joints, spine disorders, anxiety and depressive disorders, and trauma and stressor related disorders." (AR 32.) He also found Mr. Bailey's "sleep disorders" non-severe. (AR

---

[5] Mr. Bailey's girlfriend subsequently testified that his new psychotherapist was Mary Pattridge. (AR 9, 81.)

[6] *See Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); 20 C.F.R. § 404.1520.

32.) However, he determined at step three that Mr. Bailey's impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 32–34.)

The ALJ then determined that Mr. Bailey had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except that

> the claimant can occasionally climb ladders, ropes, and scaffolds; can perform simple routine work; occasionally interact with the public, coworkers, and supervisors; can understand, remember, and carry out simple instructions; and, can work in a low stress job, defined as one that requires only occasional work-related decisions and involves only occasional changes in the work setting.

(AR 34.)

In assessing Mr. Bailey's RFC, the ALJ considered medical records as well as medical opinion evidence from non-examining state agency consultants Bonnie Chavez, Ph.D., Laura Eckert, Ph.D., Patty Rowley, M.D., and David Bailey, M.D., as well as independent consultative examiners Luisa Castellanos, Ph.D. and Em Ward, M.D. (AR 34–38.) The ALJ found that Mr. Bailey's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (AR 35.)

At step four, the ALJ found that Mr. Bailey could not perform his past relevant work as an Oil Changer, Tire Repairer, or Maintenance Worker. (AR 38–39.) However, at step five, the ALJ found there were jobs in the national economy that an individual with Mr. Bailey's age, education, work experience, and RFC could perform. (AR 39.) Specifically, the ALJ determined that Mr. Bailey could work as a Collator Operator, Merchandise Marker, or Routing Clerk. (AR 39–40.) The ALJ therefore concluded Mr. Bailey was not disabled. (AR 40.) The Appeals Council denied review on October 2, 2020, and the ALJ's decision became administratively final. (AR 1–3.)

Mr. Bailey's Motion seeking reversal and remand has been fully briefed and is now before the Court.

## II. <u>Standard of Review</u>

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted).

Thus, although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

### III.  <u>Analysis</u>

Mr. Bailey makes several arguments in support of his request for reversal and remand. (Doc. 23.) Specifically, Mr. Bailey argues that: (1) the ALJ failed to properly weigh Dr. Sloan's opinions; (2) substantial evidence did not support his determination that Mr. Bailey's allegations of debilitating symptoms were not entirely consistent with the medical evidence of record; (3) substantial evidence did not support his determination that Mr. Bailey experienced only moderate limitations with respect to the 12.04(B) listing criteria; (4) he erroneously failed to find that Mr. Bailey's left lateral epicondylitis was a severe impairment; (5) he failed to adequately explain why he discounted Mr. Bailey's allegations regarding the intensity, persistence, and limiting effects of Mr. Bailey's symptoms; and, (6) he erred by failing to consider whether a combination of Mr. Bailey's impairments could result in a finding of disability. (Doc. 23 at 5-20.)

As further explained below, the Court finds that the ALJ erroneously failed to indicate whether he found Mr. Bailey's left lateral epicondylitis, or indeed any of Mr. Bailey's ailments, to be medically determinable impairments. As a result, the Court cannot determine whether the ALJ applied appropriate legal standards in failing to discuss one or more of these ailments, and symptoms arising from them, when he assessed Mr. Bailey's RFC. Also, without knowing what

medically determinable impairments the ALJ found, the Court cannot determine whether substantial evidence supported his RFC assessment. Remand is necessary so the ALJ can identify Mr. Bailey's medically determinable impairments at step two, and can include those impairments and any limitations attributable to them in his analysis of the remaining steps in the sequential evaluation process.

To qualify for DIB, a person must be "under a disability." 42 U.S.C. § 423(a)(1)(E). In this context,

> [t]he term 'disability' means . . . inability to engage in any substantial gainful activity *by reason of any medically determinable physical or mental impairment* which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A) (emphasis added). Thus, "'disability' requires both an 'inability to engage in any substantial gainful activity' and 'a physical or mental impairment, which provides reason for the inability.'" *Flaherty*, 515 F.3d at 1070 (quoting *Barnhart v. Walton*, 535 U.S. 212, 217 (2002)). Moreover, the "impairment" must be a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.*

To be "medically determinable," an impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521; *see also* 42 U.S.C. § 423(d)(3) ("[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."). Only after finding an impairment to be medically determinable will the Commissioner decide whether the impairment is "severe" at step two of the sequential

evaluation process. 20 C.F.R. § 404.1521. In other words, "the first consideration at step two is what, if any, medically determinable impairments [the] plaintiff has[.]" *Elliott v. Astrue*, 507 F. Supp. 2d 1188, 1194 (D. Kan. 2007).

There is a significant difference between a finding that an impairment is "not medically determinable" and a finding that it is "not severe," because "alleged limitations attributable to impairments which are not medically determinable must not be considered at later steps" in the sequential evaluation process, while "limitations attributed to impairments which are medically determinable but are not severe must be considered at later steps[.]" *Mizell v. Colvin*, No. CIV.A. 13-1206-JWL, 2014 WL 6453592, at *3 (D. Kan. Nov. 17, 2014) (emphases omitted); *see also Gibbons v. Barnhart*, 85 F. App'x 88, 91 (10th Cir. 2003) (ALJ must consider limiting effects of both severe and non-severe impairments, but "must consider only limitations and restrictions attributable to medically determinable impairments," in determining RFC); 20 C.F.R. § 404.1545(e) ("[W]e will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your [RFC]."); *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184, at *1 (S.S.A. July 2, 1996) ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments[.]").

Here, the ALJ failed to indicate which of Mr. Bailey's ailments he found to be medically determinable impairments. (AR 26-40.) The ALJ did find at step two that Mr. Bailey had the severe, medically determinable impairments of "dysfunction of major joints, spine disorders, anxiety and depressive disorders, and trauma and stressor related disorders[.]" (AR 32.) However, these four purported impairments are in fact merely *categories* of impairments, drawn from the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See generally* 20 C.F.R. § 404.1525(c)(3)

("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing . . . and meets the duration requirement[.]").

The overlap between Mr. Bailey's ailments and the four categories the ALJ identified is too inexact to allow the Court to determine which ailments the ALJ found to be medically determinable impairments. Thus:

- "[D]ysfunction of major joints" refers to former Listing 1.02, "Major dysfunction of a joint(s)," (AR 32), defined as "gross anatomical deformity" of a "major joint" with chronic pain and stiffness, limited or abnormal motion, "joint space narrowing, bony destruction, or ankylosis," and involvement of the hip, knee or ankle "resulting in inability to ambulate effectively" or of the shoulder, elbow, or "wrist-hand" "in each upper extremity" "resulting in inability to perform fine and gross movements effectively."[7] 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.02 (Apr. 1, 2020). Mr. Bailey has been diagnosed with several ailments that roughly correspond to this category of impairments, including bilateral finger joint swelling (*see, e.g.*, AR 380, 598-99), right long finger deformity (*see, e.g.*, AR 394-96), left lateral epicondylitis with myxoid degeneration of the extensor carpi radialis brevis tendon (*see, e.g.*, AR 654-55, 696), and right lateral epicondylitis. (AR 861-62.) However, the ALJ did not specify which of these ailments he intended to include in the category of major joint dysfunction, nor did he find that any of them satisfied all of the criteria in Listing 1.02; on the contrary, he stated that "the specified criteria required of the listing

---

[7] Effective April 2, 2021, Listing 1.02 was replaced by Listing 1.18, "Abnormality of a major joint(s) in any extremity." *See Revised Medical Criteria for Evaluating Musculoskeletal Disorders*, 85 Fed. Reg. 78164-01 (Dec. 3, 2020). The term "major joint" refers to the shoulder, elbow, "wrist-hand," hip, knee, or "ankle-foot." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00(I)(2), (3).

were not demonstrated by the available medical evidence." (AR 32.) In short, the ALJ did not indicate which of these impairments, if any, he found to be medically determinable.[8]

- The category of "[s]pine disorders" refers to former Listing 1.04, "Disorders of the spine," (AR 32), which required "compromise of a nerve root" or "the spinal cord" with "[e]vidence of nerve root compression," "[s]pinal arachnoiditis," or "[l]umbar spinal stenosis."[9] 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04 (Apr. 1, 2020). Mr. Bailey has been diagnosed with several ailments that roughly correspond to this category of impairments, including: healed T11 compression fracture (*see, e.g.*, AR 659, 705); chronic T11 compression deformity, (AR 457, 832); degenerative disc disease of the lumbar and sacral spine (AR 795); annular fissure (AR 795); facet arthropathy of the lumbar spine (AR 847); and, arthropathy and spondylosis of the cervical spine. (AR 861.) Again, however, the ALJ did not specify which of these conditions he intended to include in the category of spinal disorders, nor did he find that any of them satisfied all of the criteria for Listing 1.04.[10] Thus, the ALJ again failed to indicate which of these impairments, if any, he found to be medically determinable.

---

[8] The Commissioner argues that the ALJ did not err in failing to find that Mr. Bailey's left lateral epicondylitis was a severe impairment because this ailment "did not meet the duration requirement of at least 12 continuous months[.]" (Doc. 27 at 7.) This argument is unavailing for two reasons. First, although the Commissioner contends the ailment began in January 2018 and ended in August 2018, (*id.*), there is record evidence that Mr. Bailey suffered from it for a significantly longer period of time. (*See* AR 528 (in February 2018, Mr. Bailey reported left elbow pain "for several months" to CNP Rubin); AR 671-72 (at follow up appointment with Dr. Metzger in August 2018, two weeks after surgery, Dr. Metzger advised it could take up to 6 months for Mr. Bailey to "return to normal activity").) Second, the ALJ did not rely on the duration requirement or otherwise discuss how long Mr. Bailey suffered from left lateral epicondylitis; and, the Court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007).

[9] Effective April 2, 2021, Listing 1.04 was replaced by Listing 1.15, "Disorders of the skeletal spine resulting in compromise of a nerve root(s)," and Listing 1.16, "Lumbar spinal stenosis resulting in compromise of the cauda equina." *See* 85 Fed. Reg. 78164-01.

[10] On the contrary, the ALJ stated that "the medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04," and that "there is no evidence that the claimant's back disorder has resulted in an inability to ambulate effectively." (AR 32.)

- The category of "[a]nxiety and depressive disorders" refers to Listing 12.04, "Depressive, bipolar and related disorders," and Listing 12.06, "Anxiety and obsessive-compulsive disorders." (AR 32); 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06. "Examples of disorders that [the Commissioner] evaluate[s] in [Listing 12.04] include bipolar disorders (I or II), cyclothymic disorder, major depressive disorder, persistent depressive disorder (dysthymia), and bipolar or depressive disorder due to another medical condition." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(B)(3)(b). "Examples of disorders that [the Commissioner] evaluate[s] in [Listing 12.06]," in turn, "include social anxiety disorder, panic disorder, generalized anxiety disorder, agoraphobia, and obsessive-compulsive disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(B)(5)(b). Mr. Bailey's medical records reference at least four psychological diagnoses that roughly correspond to this category of impairments, *i.e.*, GAD, Bipolar II disorder, major depressive disorder, and unspecified mood disorder. (AR 474, 499–519, 529-32, 534-37, 540-43, 546-48, 622-24, 747-50, 758-61, 768-78.) Once again, however, the ALJ did not specify which of these ailments he intended to include in the category of anxiety and depressive disorders, nor did he find that any of them met all of the criteria for Listing 12.04 or Listing 12.06. On the contrary, he found that Mr. Bailey's psychological impairments "do not meet or medically equal the criteria" of these listings. (AR 32.) As such and yet again, the ALJ did not indicate which of these impairments, if any, he found to be medically determinable.

- Finally, the category of "trauma and stressor related disorders" refers to Listing 12.15, (AR 32), which includes "posttraumatic stress disorder and other specified trauma and stressor-related disorders (such as adjustment-like disorders with prolonged duration without

prolonged duration of stressor)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 12.00(B)(11)(b), 12.15. Mr. Bailey's medical records include references to PTSD by history. (AR 365, 385, 387, 629; *cf.* AR 474 (diagnosing Mr. Bailey with GAD and stating that his anxiety was "not better explained by . . . reminders of traumatic events in post-traumatic stress disorder").) However, the ALJ did not (i) state whether he found Mr. Bailey suffered from PTSD and/or some other trauma or stressor-related disorder, (ii) find that the disorder(s) satisfied the criteria of Listing 12.15, or (iii) indicate whether he found the disorder(s) to be medically determinable. (AR 32.)

The ALJ did refer to some of Mr. Bailey's ailments in discussing his assessment of Mr. Bailey's RFC. Specifically, he mentioned that diagnostic testing and imaging showed cervical arthropathy, spondylosis, and degenerative changes, a lumbar disc bulge, and a "mild," "well-healed" compression fracture. (AR 35.) However, he did not state whether he found one or more of these spinal disorders to be medically determinable impairments. And he failed to even mention Mr. Bailey's other spinal disorders of chronic, moderate thoracic compression deformity, lumbosacral annular fissure, and lumbar facet arthropathy. Likewise, he failed to discuss Mr. Bailey's bilateral finger joint swelling, left lateral epicondylitis with myxoid degeneration of the extensor carpi radialis brevis tendon,[11] right lateral epicondylitis, GAD, major depressive disorder, and mood disorder.[12]

---

[11] Not only did the ALJ completely fail to discuss the operative and pathology reports documenting Mr. Bailey's diseased left elbow tendon, but also he took pains to point out an x-ray showing the left elbow to be "intact." (AR 35 (citing AR 701); *cf.* AR 654-55, 696.)

[12] Indeed, the ALJ's assessment of Mr. Bailey's work-related mental abilities is not tethered to any specific psychological ailments at all. Instead, the ALJ merely referenced the broad categories in Listings 12.04, 12.06, and 12.15, and selectively discussed mental health symptoms, clinical presentations, and limitations. (AR 36-38.)

Nor can the Court confidently deduce which of Mr. Bailey's ailments the ALJ found to be medically determinable and which he did not based on his discussion of Mr. Bailey's symptoms, even assuming it would be appropriate for the Court to engage in such a speculative exercise. Beyond anything else, the ALJ did not discuss all of Mr. Bailey's symptoms, and the Court does not know whether he left some of them out because he found the impairments that caused them were not medically determinable, or for some other reason. For example, the ALJ did not discuss Mr. Bailey's thoracic spine pain, (*see, e.g.*, AR 634-35, 659, 841-42), headaches associated with cervical spine pain, (*see, e.g.*, AR 836, 856), or sleep disturbance associated with anxiety.[13] (*See, e.g.*, AR 474.) But it would be pure speculation for the Court to conclude that the ALJ did not find Mr. Bailey's thoracic spine disorders, cervical spine disorders, and GAD to be medically determinable based solely on the fact that he failed to mention these symptoms.

Similarly, although the ALJ did discuss Mr. Bailey's "elbow pain," he generally failed to indicate whether he was referring to Mr. Bailey's left elbow, right elbow, or both. (AR 26-40.) And, though he referenced "changing conditions in [Mr. Bailey's] left elbow" to support his RFC assessment, he did not state whether he also considered Mr. Bailey's right elbow pain. (AR 37.) But again, it would be speculative for the Court to conclude that the ALJ did not find Mr. Bailey's right lateral epicondylitis to be medically determinable based on the fact that he did not appear to consider this symptom. (AR 35, 37.)

The ALJ's failure to indicate what ailments he found to be medically determinable prevents the Court from determining whether he applied appropriate legal standards in omitting some

---

[13] The ALJ did find that Mr. Bailey's "sleep disorders" are "non-severe" because "this impairment is controlled with continuous positive airway pressure (CPAP) treatment." (AR 32.) However, a CPAP machine is generally prescribed to treat snoring and sleep apnea, and there is nothing in the record to indicate that, in Mr. Bailey's case, it was intended to or did in fact address his sleep disturbance associated with anxiety. *See* "Continuous positive airway pressure (CPAP)," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sleep-apnea/multimedia/continuous-positive-airway-pressure-cpap/ (last visited Dec. 10, 2021).

symptoms from his explanation of his RFC assessment. For example, the ALJ explained that he limited Mr. Bailey to light work and occasional climbing of ladders, ropes, and scaffolds due to Mr. Bailey's "low back pain, elbow pain, joint pain, and associated weakness." (AR 38.) He did not indicate whether he was considering Mr. Bailey's right elbow pain and did not rely on any symptoms caused by Mr. Bailey's thoracic and cervical spine disorders to support these exertional limitations.[14] (AR 38.) The Court does not know the reason for these omissions. The reason may be that the ALJ found Mr. Bailey's thoracic spine, cervical spine, and right elbow impairments not medically determinable, and this reason would be legally proper.[15] *Flaherty*, 515 F.3d at 1070; *Mizell*, 2014 WL 6453592 at *3. Alternatively, the ALJ could have simply failed to consider these symptoms by mistake.

The ALJ's failure to indicate what ailments he found to be medically determinable also prevents the Court from assessing whether substantial evidence supports his RFC assessment. (AR 32-38.) For example, it is possible the ALJ properly found Mr. Bailey's back pain to be less debilitating than alleged because he found that some of Mr. Bailey's spinal disorders were not medically determinable. However, it is also possible he erroneously failed to consider whether and to what extent these disorders contributed to Mr. Bailey's limitations. Likewise, the ALJ may have properly found Mr. Bailey's work-related mental limitations to be less severe than alleged because he found that some of Mr. Bailey's psychological ailments were not medically determinable; alternatively, he may have mistakenly failed to consider these ailments and the limitations they caused or exacerbated. Without knowing the universe of evidence the ALJ should have considered, the Court cannot determine whether substantial evidence supports his conclusions.

---

[14] He also failed to specify which joints he was referring to when he mentioned "joint pain." (AR 38.)

[15] The Court expresses no opinion here about whether there is substantial evidence in the record to support the ALJ's hypothetical determination that any given impairment was not medically determinable.

Other courts have found remand to be necessary where an ALJ failed to indicate whether she found a claimant's ailment to be a medically determinable impairment. In one such case, the Commissioner argued that the ALJ did not err by failing to determine whether some of the claimant's impairments were medically determinable, because the ALJ discussed one of the impairments and "significantly discounted it," and record evidence suggested the rest were "insignificant." *Lee v. Colvin*, No. CIV.A. 12-1439-JWL, 2014 WL 1116773, at *3 (D. Kan. Mar. 20, 2014). The court rejected this argument, noting that, although the ALJ's

> decision might be read to suggest that several alleged impairments identified by Plaintiff are insignificant, and . . . specifically discounted the significance of Plaintiff's lumbar arthralgia, . . . it did not state that any of those impairments are medically determinable impairments in the facts and circumstances of this case, it did not make a finding whether those impairments are severe within the meaning of the Act, and it did not specifically express whether it considered those impairments when assessing RFC. Thus, the court is unable to determine whether the correct legal standard was applied in evaluating these impairments.

*Id.* at *4.

The *Lee* court went on to observe that, if the claimant's ailments "are medically determinable impairments, the ALJ must consider their (admittedly minimal) effect in assessing RFC. But, if they are not medically determinable impairments, it would have been error for the ALJ to consider their (alleged) effect in assessing RFC." *Id.* The court therefore concluded that the ALJ's failure to indicate whether she found the claimant's ailments to be medically determinable created an "ambiguity" that "must be resolved . . . on remand." *Id.*; *see also Elliott*, 507 F. Supp. 2d at 1195 (remanding for Commissioner to determine whether two of claimant's ailments were "medically determinable impairments in the circumstances and, if so, to include those impairments in his consideration and analysis regarding the remaining steps in the sequential evaluation process"); *Terrell v. Berryhill*, No. 16-CV-02566-MEH, 2017 WL 1352275, at *9 (D. Colo. Apr. 13, 2017) (same); *cf. Mizell*, 2014 WL 6453592 at *3-*4 (remanding to Commissioner

to adequately explain bases for ALJ's decision that one of claimant's ailments was not medically determinable).

Likewise, remand in this case is necessary so the ALJ can indicate which of Mr. Bailey's impairments are medically determinable, and can include those impairments and any symptoms and limitations attributable to them in his analysis of the remaining steps in the sequential evaluation process. The Court will not address Mr. Bailey's remaining claims of error at this time because they may be affected by the ALJ's treatment of this case on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV.  <u>Conclusion</u>

For the reasons stated above, Plaintiff's Motion to Reverse the Administrative Law Judge (ALJ's) Unfavorable Decision Dated February 27, 2020, or Alternatively, to Remand the Case Back to the Administrative Law Judge (Doc. 22) is hereby GRANTED. The decision of the Commissioner is hereby REVERSED and this matter is REMANDED to the Commissioner for further proceedings in accordance with this Memorandum Opinion and Order.

IT IS SO ORDERED.

KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent